**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| KAREN NELSON, | CASE NO. 1:22-CV-02220 |
| Plaintiff, | MAGISTRATE JUDGE AMANDA M. KNAPP |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | <u>**MEMORANDUM OPINION AND ORDER**</u> |

Plaintiff Karen Nelson ("Plaintiff" or "Ms. Nelson) seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying her

application for Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This matter is before the undersigned by consent of the parties

under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Doc. 7.)

For the reasons set forth below, the Court **AFFIRMS** the Commissioner's final decision.

## I.      Procedural History

On March 2, 2020, Ms. Nelson filed a DIB application, alleging a disability onset date of

September 1, 2015.  (Tr. 72, 296-99.)  Ms. Nelson subsequently amended her alleged onset date

to August 24, 2018, the date after a prior unfavorable decision.  (Tr. 72, 120.)  She asserted that

she was disabled due to fibromyalgia, diabetes, depression, being evaluated for psoriatic arthritis,

and Sjogren's syndrome.  (Tr. 177, 187, 200, 218, 322.)  Her application was denied at the initial

level (Tr. 196-200) and upon reconsideration (Tr. 214-18).  She then requested a hearing.  (Tr.

219-22.)  On August 20, 2021, Ms. Nelson appeared for a telephonic administrative hearing

before an Administrative Law Judge ("ALJ").  (Tr. 115-49.)  On August 31, 2021, the ALJ

issued an unfavorable decision, finding Ms. Nelson had not been under a disability from August

24, 2018, the alleged onset date, through December 31, 2020, the date last insured.  (Tr. 69-91.)

Ms. Nelson requested review of the decision by the Appeals Council. (Tr. 293-95.)  On

November 15, 2022, the Appeals Council denied Ms. Nelson's request for review, making the

ALJ's decision the final decision of the Commissioner.  (Tr. 1-7.)  Ms. Nelson then filed this

pending appeal (ECF Doc. 1), which is fully briefed (ECF Docs. 10, 14).

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Ms. Nelson was born in 1975 and was forty-five years old on the date last insured.  (Tr.

86.)  At the time of the hearing, she lived with her ex-husband.  (Tr. 121.)  She had earned an

associate degree in liberal arts and worked in retail as a cashier and stocker and as a housekeeper.

(Tr. 123-31.)  Her most recent work attempts were in 2019 at two retail stores, but neither

attempt lasted more than a couple of days.  (Tr. 123.)

### B.     Medical Evidence

#### 1.     Relevant Treatment History

##### i.     Physical Impairments

On July 26, 2019, Ms. Nelson presented to Kimberly Conley, APRN-CNP, a primary

care provider at MetroHealth.  (Tr. 439-42.)  CNP Conley reviewed Ms. Nelson's recent lab

results, which showed elevated A1c and cholesterol.  (Tr. 439.)  Ms. Nelson was on Metformin

for management of her diabetes, but she had run out.  (Tr. 439, 442.)  She was also out of her

cholesterol medication.  (Tr. 439.)  Ms. Nelson had no complaints.  (*Id*.)  Her physical

examination findings were unremarkable.  (Tr. 441.)  CNP Conley restarted Ms. Nelson on

2

Metformin for uncontrolled type 2 diabetes.  (Tr. 442.)  She also prescribed: Lipitor for

hyperlipidemia; Abilify for major depressive disorder, recurrent, episode, moderate; Zestril for

elevated blood pressure; and Vitamin D for Vitamin D deficiency.  (*Id*.)  CNP Conley instructed

Ms. Nelson to return for follow up in three to four months.  (*Id*.)

On July 26, 2019, Ms. Nelson also saw Leah Hellerstein, M.D., at MetroHealth for an

OB/GYN appointment.  (Tr. 442-43.)  Dr. Hellerstein discussed lab results showing elevated

prolactin levels and noted that her primary care physician referred her to an endocrinologist in

September 2018.  (Tr. 442.)  Ms. Nelson had not followed up on the referral but expressed

interest in seeing an endocrinologist.  (*Id*.)  She complained of blurry vision for several months

even when she wore glasses.  (*Id*.)  She denied issues with her peripheral vision and "near

misses" when walking.  (*Id*.)  Dr. Hellerstein suspected prolactin was elevated due to Abilify.

(Tr. 423.)  She referred Ms. Nelson to an endocrinologist and recommended a brain MRI.  (*Id*.)

On July 30, 2019, Ms. Nelson's rheumatologist at MetroHealth, Raymond Hong, M.D.,

declined to approve a prescription refill for meloxicam because Ms. Nelson had not seen him

since March 2018.  (Tr. 438.)  Ms. Nelson was instructed that she would need to schedule an

appointment with him or request that her primary care physician refill the prescription.  (Tr. 438-

39.)  Ms. Nelson indicated she had an upcoming appointment with her primary care physician

scheduled and declined to schedule an appointment with Dr. Hong.  (*Id*.)

On August 8, 2019, Ms. Nelson presented to Najmul Siddiqi, M.D., at MetroHealth for a

cardiology consult due to an abnormal EKG.  (Tr. 432.)  She reported she had "developed

progressively worsening shortness of breath over [the] past [three] years associated with weight

gain."  (*Id*.)  She said that her physical activity was limited by her shortness of breath and pain in

her legs, knees, and hips.  (Tr. 432-33.)  Physical examination findings were unremarkable.  (Tr.

3

435.) Dr. Siddiqi felt that the most likely etiology of Ms. Nelson's shortness of breath was obesity with physical deconditioning. (Tr. 437.) Dr. Siddiqi's recommendations included an echocardiogram and weight loss with diet and lifestyle changes. (437.)

MetroHealth treatment records dated November 11, 2019, reflect that Ms. Nelson reported consistently taking her diabetic medication, but that her blood sugar readings at home were in the 300s. (Tr. 419.) She felt her diet was a factor, noting that she cooked half of the week and ate out or had take-out the other half. (*Id*.) She also said that she had been in weight management but had stopped attending and was not following a specific diet or exercise routine. (*Id*.) She reported intentionally losing thirty-five pounds over the prior six months. (*Id*.)

On January 14, 2020, Ms. Nelson presented to Maria Antonelli, M.D., at MetroHealth's rheumatology clinic for her Sjogren's syndrome and fibromyalgia.[1] (Tr. 423-26.) She reported swelling in her legs and ongoing pain, mostly in her knees and back. (Tr. 423-24.) She said Motrin 400 mg, once or twice a day, and gabapentin helped with her pain, but Elavil, Trazodone, Mobic, and Cymbalta did not help. (*Id*.) She said her pain was worse with standing. (Tr. 424.) Examination findings were generally normal, including: a normal gait; no pedal edema; strong pulses in extremities; full range of motion in the elbows, wrists, and ankles; no back tenderness or spasms; and normal grip strength. (Tr. 424-25.) There was no swelling or effusion in the knees, but there was tenderness and pain on range of motion in the knees. (Tr. 425.) Dr. Antonelli also observed mild scaling erythema. (Tr. 424.) Dr. Antonelli prescribed clobetasol for suspected psoriasis in Ms. Nelson's knuckles, ears, and elbows. (Tr. 425.) She noted Ms. Nelson had a good response with gabapentin, but with swelling, and recommended that she stop Motrin and start trials of nabumentone, Lyrica, and Pilocarpin. (Tr. 425-26.) She also

---

[1] Ms. Nelson was transferring her care from Drs. Magrey and Hong. (Tr. 423.)

4

recommended spine x-rays, noting that an MRI might be needed to rule out spondylosis if the x-rays were negative and there was a good response to NSAIDs.  (Tr. 426.)  In response to Ms. Nelson's report that she could not work because of knee pain, Dr. Antonelli referred her to vocational training, noting she had "some retail skills, not much other training."  (*Id.*)

On February 14, 2020, Ms. Nelson returned to CNP Conley for follow up.  (Tr. 418-22.) She was taking Metformin 1000 mg once a day; she could not tolerate 2000 mg twice a day.  (Tr. 418.)  She was checking her blood sugars at home every other day, and her levels were in the high 200s / low 300s.  (*Id.*)  Physical examination findings were normal, except for tachycardia. (Tr. 421-22.)  Her diagnoses included type 2 diabetes, morbid obesity, gastroesophageal reflux disease, Vitamin D deficiency, Sjogren's syndrome, and hyperlipidemia.  (Tr. 422.)

On February 26, 2020, Ms. Nelson presented for a vocational services initial consultation with Meggan Few, a Vocational Rehabilitation Counselor, at MetroHealth.  (Tr. 415-16.)  She reported that her primary disabilities were fibromyalgia, type 2 diabetes, and Sjogren's syndrome.  (Tr. 415.)  She reported that her diabetes was not well maintained because she ate "terribly," stating that she ate most of her meals from take out because she was either in too much pain or too fatigued to cook, and there was limited food in the house due to limited income and no food stamps.  (*Id.*)  She said she had been prescribed a new medication and referred for nutritional counseling.  (*Id.*)  She was unable to attend her nutritional counseling appointment due to illness, but planned to reschedule.  (*Id.*)  Aside from severe dry mouth and a dry nose and eyes, she reported that Sjogren's syndrome was not "a barrier for her but more of a nuisance and discomfort."  (*Id.*)  She reported that her work history was primarily entry-level retail work, and that she had a limited work history since 2015 due to leg pain and an inability to maintain employment.  (Tr. 415-16.)  She had applied for sedentary, administrative jobs but had not been

successful in getting interviews, which she thought was due her lack of experience in those areas. (Tr. 416.)  She reported feeling overwhelmed by her medical situation, saying she felt her treatment was not helping and was concerned she had been misdiagnosed.  (*Id*.)  She reported depression and anxiety related to her situation and said she was scheduled to start behavioral health services in March.  (Tr. 415.)  Following the vocational counseling session, Ms. Nelson decided she would apply for services with Opportunities for Ohioans with Disabilities and indicated that she might consider getting training in the clerical field to bridge the gap of having no work history in that area.  (Tr. 416.)

On March 3, 2020, Ms. Nelson had x-rays of her knees, lumbar spine, and sacroiliac joints.  (Tr. 509-14.)  The knee x-rays revealed no acute fractures, dislocations, or obvious degenerative changes.  (Tr. 509-11.)  The x-ray of the sacroiliac joint was negative.  (Tr. 511-12.)  The lumbar spine x-ray showed minimal degenerative spurring with: "Minimal spondylotic change, unremarkable for age. No acute osseous abnormality."  (Tr. 512-13.)

On May 12, 2020, Ms. Nelson returned to Dr. Antonelli for a rheumatology follow up. (Tr. 653-57, 689-94.)  She was living with her ex-husband and said they got along well.  (Tr. 654.)  She reported that she had been unable to hold down a job for more than two shifts since 2015 because she was so tired that she could not get out of bed the next day, and was applying for disability.  (*Id*.)  She was seeing a therapist for depression, but said she had a positive and hopeful outlook.  (*Id*.)  She had tried medication for her dry mouth, but it caused too much nausea so she did not continue with it.  (*Id*.)  She was using eye drops once a day for her dry eyes.  (*Id*.)  She reported a recent rash on her hands and ears that she thought was psoriasis.  (*Id*.) She had knee pain at rest and with activity, worse with stair climbing, and she felt stiff all day. (*Id*.)  She took ibuprofen 400 mg intermittently, but it did not really help.  (*Id*.)  She also reported

6

no relief from knee injections she received the prior year. (*Id.*) She was taking Lyrica for fibromyalgia pain; she was not sure if it was helpful or not, but her dose was recently increased. (*Id.*) She had also started a Medrol Dosepak for leg pain, which she felt helped her feel better "overall." (*Id.*) She reported that her diet was poor, and she did not exercise. (Tr. 654-55.)

On examination, Ms. Nelson appeared healthy, and was alert, pleasant, and cooperative. (Tr. 655.) Her examination findings also revealed: no rash; no pedal edema; a normal gait; no swelling in her arms or legs; full range of motion in her elbows and wrists; normal grip strength; mildly reduced lateral rotation and flexion in the neck; bilateral tenderness in the ankles, but full range of motion and no swelling; pain on range of motion in the knees, but no swelling, crepitation, or effusion. (Tr. 655-56.) Dr. Antonelli recommended that Ms. Nelson continue Lyrica. (Tr. 656.) She recommended a sleep study for suspected untreated obstructive sleep apnea, noting that Ms. Nelson's sleep problems needed to be addressed to make sure they were not "worsening her daytime limitations." (Tr. 656-57.) She also put in a request for a shower chair, due to reported problems standing long enough to wash thoroughly, and encouraged Ms. Nelson to make small changes in her diet and start exercise and short walks. (*Id.*)

On July 22, 2020, Ms. Nelson participated in her first pharmacy disease management appointment with Pharmacy Specialist Mary Ann Dzurec, PharmD, BCACP and Sarah Crisp, PharmD Candidate for diabetes and hyperlipidemia. (Tr. 712-17.) The appointment was conducted via telephone. (Tr. 712.) Ms. Nelson reported that she was not exercising, but was open to trying swimming. (Tr. 713.) As far as her diet, she reported that she had issues with portion control. (*Id.*) Her blood sugars were not at goal. (Tr. 716.) She was started on Trulicity for her diabetes and instructed to continue taking Metformin and glimepiride. (Tr. 717.) She was also prescribed atorvastatin for dyslipidemia. (*Id.*)

7

When Ms. Nelson met again with Pharmacy Specialist Dzurec on August 11, 2020, her blood sugars were above her goal.  (Tr. 723.)  She reported that she was not exercising and was having problems with portion control.  (Tr. 719.)  Her Trulicity was increased.  (Tr. 723.)

On August 13, 2020, Ms. Nelson attended a follow-up visit via telephone with CNP Conley.  (Tr. 724-25.)  She reported that her blood sugars were much better since starting Trulicity and she was "[o]therwise doing well" with no complaints.  (*Id*.)  She denied side effects and reported that she was scheduled to increase her Trulicity dosing the next week.  (Tr. 724-25.)

On September 8, 2020, Ms. Nelson attended a follow-up visit with Dr. Antonelli via telephone.  (Tr. 725-28.)  She reported that her knee pain was worse.  (Tr. 726.)  She said she was doing laundry in the basement, noting that it involved three trips up and down the stairs.  (*Id*.)  She also said she had been doing "a lot of walking around the area."  (*Id*.)  She reported stiffness in her whole body and a lot of back pain, with mild/minimal improvement with activity.  (*Id*.)  She was taking Lyrica, which did not help at all, and Medrol, which helped her joints.  (*Id*.)  Dr. Antonelli recommended a trial of Plaquenil, due to a good response to steroids in the past, and increased Lyrica, but noted she might stop Lyrica if Ms. Nelson did not improve with the higher dose.  (Tr. 728.)  She also referred Ms. Nelson for a sleep study.  (*Id*.)

During a September 29, 2020 telephonic appointment with pharmacist Maribel Rangel, RPh, Ms. Nelson continued to report that she was not exercising, but was open to trying swimming.  (Tr. 729.)  She continued to report issues with portion control.  (*Id*.)  She also reported the following symptoms: blurred vision, tingling, and polydipsia.  (Tr. 731.)  Ms. Nelson's diabetic and dyslipidemia medications were increased.  (Tr. 735.)

On January 8, 2021, Ms. Nelson had a telephone appointment with Pharmacy Specialist Dzurec.  (Tr. 736-42.)  She was not exercising and did not start swimming as planned in the

summer due to transportation issues.  (Tr. 737.)  Although she reported working with a dietician, she had not made changes to her diet for diabetes.  (*Id*.)  She reported feeling fatigued all the time and intermittent headaches, which she attributed to sleep apnea.  (Tr. 738.)  She continued to take Metformin, Trulicity, and glimepiride for diabetes, with increases in dosing.  (Tr. 741.)

On January 12, 2021, Ms. Nelson returned to Dr. Antonelli for a follow-up appointment. (Tr. 742.)  She reported some dizziness after a brief trial of Plaquenil, but was not sure of the cause since she had also started a new diabetic medication.  (Tr. 743.)  It was hard to tell if the Plaquenil helped with her joint pains, but she reported fewer flare ups of her arthritis, explaining she had not had an arthritis flare up in "a long while."  (*Id*.)  She felt her current dose of Lyrica was helpful, but still felt stiff all day.  (*Id*.)  She reported not doing "much exercise aside from stairs."  (*Id*.)  Dr. Antonelli continued Lyrica at the same dose (Tr. 743, 745) and noted that Plaquenil had been discontinued because it caused too much dizziness (Tr. 745).  Dr. Antonelli encouraged Ms. Nelson to make dietary changes for her diabetes and weight loss.  (*Id*.)

On March 1, 2021, Ms. Nelson had a telephonic appointment with CNP Conley.  (Tr. 811-12.)  She reported she had been following with the pharmacy department regarding her diabetes, but had missed her most recent appointment due to transportation issues.  (Tr. 811.)  It was noted that Ms. Nelson could not tolerate maximum dosing of Metformin and her Trulicity was recently increased.  (Tr. 812.)  Ms. Nelson said she could not make dietary changes due to financial strains.  (*Id*.)  Her medications were unchanged.  (*Id*.)

On March 16, 2021, Ms. Nelson presented to Constance Park, APRN-CNP, for a rheumatology follow up.  (Tr. 804-11.)  She reported increased pain in her back, legs, and knees. (Tr. 804, 806.)  She reported gaining ten pounds in the past year and using a cane to get around for about a year.  (Tr. 804.)  She also reported very poor sleep and financial concerns.  (Tr. 806.)

9

During the examination, Ms. Nelson ambulated with a cane.  (Tr. 805.)  She exhibited: full range of motion in the elbows and wrists; full range of motion in the shoulders, but with pain to touch and with range of motion; and mildly reduced range of motion in the neck.  (*Id*.)  She had full grip strength.  (*Id*.)  She also had full strength in her lower extremities, but with lumbar, thoracic midline, and paraspinal tenderness that was worse with extension and better with flexion.  (Tr. 805-06.)  She had full range of motion in her knees with no warmth, effusion, or crepitations. (Tr. 806.)  She had no tenderness or warmth in her ankles, but there was mild swelling or possible adipose in the ankles.  (*Id*.)  Her gait was non-antalgic.  (*Id*.)  CNP Park recommended that Ms. Nelson continue taking Lyrica because there appeared to be some benefit and she was tolerating it well.  (*Id*.)  Although Ms. Nelson's symptoms had gotten worse over the prior few months, CNP Park suspected that contributing factors were weight gain, anxiety, and lack of sleep.  (*Id*.)  CNP Park recommended an updated sleep study, referral to psychology for talk therapy, and lifestyle changes for improvement in overall health and pain.  (*Id*.)

On June 9, 2021, Ms. Nelson returned to CNP Conley for follow up.  (Tr. 821-26.)  Her diabetes was noted to be improving, but she needed a referral for a pharmacy specialist.  (Tr. 821.)  She was mildly tachycardic but asymptomatic.  (Tr. 821, 825.)  On examination, she had normal musculoskeletal and neurological findings with an intact gait.  (Tr. 825.)  CNP Conley provided pharmacy and podiatry referrals and made a "cardiovascular event detector service [request]."  (Tr. 825.)

### ii.    Mental Impairments

Ms. Nelson has received treatment for depression and anxiety.  (Tr. 414, 419, 705.) Primary care treatment notes reflect that in June 2019 she was not receiving psychological treatment, but she had been taking Abilify and Cymbalta for a few years for her mental health

10

impairments and it was "working really well." (Tr. 419.)  In November 2019, she reported suicidal thoughts, but no plan and said she was scheduled for a mental health appointment. (*Id*.)

When she presented to CNP Conley on February 14, 2020, for follow-up care, she reported that her mood was improved since increasing Abilify and she was scheduled to see a counselor in March.  (Tr. 418-19.)  She also reported that her mood had improved since her divorce had been finalized.  (Tr. 419.)  Although divorced, she reported that she and her ex-husband were living together because neither had anywhere else to go.  (*Id*.)  On examination, her mood, memory, affect, and judgment were normal.  (Tr. 422.)

On May 29, 2020, Ms. Nelson participated in a telephonic behavioral health counseling and therapy session with Sarah Benuska, Ph.D., at MetroHealth.  (Tr. 701-04.)  She said she wanted to reduce her depression, eat better, and cope with her living situation.  (Tr. 701.)  She reported crying a lot in part due to her pain, but she also reported that she had started attending school earlier that month and she was feeling more hopeful and purposeful.  (*Id*.)  On mental status examination, she was oriented to time, person, and place.  (Tr. 703.)  Her speech was spontaneous with a normal rate and flow.  (*Id*.)  Her thought processes were logical and organized and no abnormal processes were noted.  (*Id*.)  Her judgment and insight were good. (*Id*.)  Her associations were tight.  (*Id*.)  Her memory was within normal limits, but she reported difficulty with her attention span and concentration.  (*Id*.)  Her language was appropriate and her fund of knowledge was okay.  (*Id*.)  Her mood was depressed and anxious, but she had a full range affect.  (*Id*.)  She was diagnosed with moderate episode of recurrent major depressive disorder and generalized anxiety disorder.  (Tr. 705.)  She was instructed to schedule her next appointment.  (Tr. 704.)  Ms. Nelson continued to treat with her primary care provider CNP Conley, but it does not appear that further behavioral health therapy sessions were scheduled.

## 2.     Opinion Evidence

### i.     Treating Source

On July 6, 2021, Dr. Antonelli completed a Medical Source Statement: Patient's Physical Capacity statement.  (Tr. 813-14.)  Dr. Antonelli opined that Ms. Nelson was limited to: lifting/carrying ten pounds occasionally and one-to-two pounds frequently; standing/walking for up to two hours in a workday but without interruption for only one minute; and sitting for a total of sixteen or more hours and without interruption for two hours.  (Tr. 813.)  Dr. Antonelli also opined that Ms. Nelson could never climb, balance, stoop, crouch, kneel, or crawl, but could frequently reach, push/pull, and perform fine and gross manipulation.  (Tr. 813-14.)  Dr. Antonelli found no environmental restrictions and also indicated that Ms. Nelson was not prescribed a cane, walker, brace, or TENS unit.  (Tr. 814.)  She opined that Ms. Nelson's pain was moderate and would interfere with concentration, take her off task, and cause absenteeism. (*Id*.)  She also opined that Ms. Nelson would need: the ability to alternate positions between sitting, standing, and walking, at will; and the ability to take additional unscheduled rest periods during an eight-hour workday, adding up to one to two hours of additional rest time during the workday.  (*Id*.)  When asked to identify the medical findings supporting her assessment of Ms. Nelson's exertional and postural limitations, Dr. Antonelli's hand-written notes state: "physical" or "physical exam" and "history."  (Tr. 813.)  As to manipulation limitations, Dr. Antonelli's notes state: "report" and "exam."  (Tr. 814.)  And as to environmental limitations, Dr. Antonelli's notes state: "patient report."  (*Id*.)

### ii.     Consultative Examiner

On September 10, 2020, Ms. Nelson presented to Janis Woodworth, Ph.D., at IMA Evaluations of Ohio, Inc. for a consultative psychological evaluation.  (Tr. 677-84.)  When Dr.

Woodworth asked Ms. Nelson why she could not work, Ms. Nelson said she had fibromyalgia and severe pain in her legs, knees, and hips.  (Tr. 677.)  She reported depression and anxiety.  (Tr. 679.)  She was cooperative and related adequately during the evaluation.  (*Id*.)  She was observed using a walker.  (Tr. 680.)  Her motor behavior was restless and she had fair eye contact on examination.  (*Id*.)  Her speech was fluent and clear.  (*Id*.)  Her thought processes were coherent and goal directed.  (*Id*.)  She had a depressed and anxious affect and her mood was dysthymic and anxious.  (*Id*.)  She was able to perform five out of five trials of serial 7s correctly; she could immediately recall 3 out of 3 objects presented verbally and 3 out of 3 objects after a five-minute time delay; and she could perform digits forward through 6 digits and digits backwards through 4 digits.  (*Id*.)  Her cognitive functioning appeared to be in the average range and her insight and judgment were fair.  (*Id*.)

Ms. Nelson reported that she needed assistance from her ex-husband for most of her activities of daily living.  (Tr. 681.)  She said she could dress herself on top, but she needed assistance getting bottoms on.  (*Id*.)  She could take a shower, but could not bend over to wash her legs.  (*Id*.)  She did not have a shower seat.  (*Id*.)  She cooked only using a microwave.  (*Id*.)  As far as household cleaning or chores, she said she could vacuum one room before developing severe back pain and she could not do laundry because it was located in the basement, and she could not climb stairs.  (*Id*.)  She and her ex-husband ordered groceries online.  (*Id*.)  She was able to drive and manage money.  (*Id*.)  She did not socialize, but reported that her family relationships, including her relationship with her sister and ex-husband, were okay.  (*Id*.)  She enjoyed genealogy and spent her day watching television, listening to music, and playing a game on Facebook.  (*Id*.)  She used a computer and tablet at home but did not have a phone.  (*Id*.)

13

Dr. Woodworth diagnosed persistent depressive disorder and unspecified anxiety disorder.  (Tr. 681.)  She rated Ms. Nelson's work-related mental abilities as follows:

- She did not appear to have more difficulty than same age peers in understanding, remembering, and carrying out instructions;

- She should have no more difficulty than same age peers in maintaining attention and concentration, and in maintaining persistence and pace to perform simple tasks, but may have some difficulty with multi-step tasks;

- She should have no more difficulty than same age peers in responding appropriately to supervision and to coworkers in a work setting; and

- She may have some difficulty responding appropriately to work pressures in work setting as compared to same age peers if she is feeling anxious.

(Tr. 683.)

### iii.    State Agency Reviewers

#### a.    State Agency Medical Consultants

On June 4, 2020, state agency medical consultant Mehr Siddiqui, M.D., adopted the physical RFC set forth in the prior ALJ decision dated August 23, 2018, and opined that Ms. Nelson was capable of work at the light exertional level except that she could not climb ladders, ropes or scaffolds; she could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; she could frequently perform overhead reaching; she could not have concentrated exposure to extremely cold temperatures; and she could not have exposure to hazards (heights, machinery, or commercial driving).  (Tr. 182.)  In reaching his opinion, Dr. Siddiqui reviewed medical evidence dated 2018 through 2020.  (Tr. 178-79.)

On March 7, 2021, on reconsideration, state agency medical consultant Gail Mutchler, M.D., affirmed the findings of Dr. Siddiqui. (Tr. 191.)  In reaching her opinion, Dr. Mutchler reviewed Ms. Nelson's interval medical evidence, including medical evidence dated 2020 through early 2021.  (*Id*.)

14

b.      **State Agency Psychological Consultants**

On September 22, 2020, state agency psychological consultant Robyn Murry-Hoffman, Psy.D., completed a Psychiatric Review Technique ("PRT") (Tr. 180-81) and mental RFC assessment (Tr. 183-84).  In the PRT, Dr. Murry-Hoffman opined that Ms. Nelson had moderate limitations in her ability to: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.  (Tr. 180.)  In the mental RFC assessment, Dr. Murry-Hoffman opined that Ms. Nelson was limited to simple, one-to two-step, and familiar three-step instructions; she was limited to a simple learned work routine that did not have fast-paced production demands; she was limited to brief, superficial interactions; and could adapt to a structured and predictable work setting with infrequent changes in responsibilities and expectations.  (Tr. 183-84.)

On March 4, 2021, on reconsideration, state agency psychological consultant Jaime Lai completed a PRT (Tr. 189-90) and mental RFC assessment (Tr. 192-93).  She affirmed Dr. Murry-Hoffman's findings.  (*Compare* Tr. 180, 183-84 *with* Tr. 189, 192-93.)

**C.      Hearing Testimony**

**1.      Plaintiff's Testimony**

At the telephonic hearing on August 20, 2021, Ms. Nelson testified in response to questioning by the ALJ and her counsel.  (Tr. 121-43.)  Ms. Nelson was forty-six years old.  (Tr. 121.)  She was living with her ex-husband, who also did not work.  (*Id*.)  Her ex-husband's mother helped them financially.  (Tr. 122-123.)  Ms. Nelson usually only left the house for doctor appointments.  (Tr. 122.)  Although she was able to drive, her ex-husband usually drove her because she did not feel comfortable going alone due to her anxiety and it was easier for her

to be dropped off than to park herself and walk.  (Tr. 122, 137-38.)  She tried to work at the end of 2019 in two retail jobs, but she only lasted a couple of days in each job.  (Tr. 123.)

When asked why she was unable to work full time, Ms. Nelson said that it had been very difficult for her to find a job that did not require her to exert herself or move her body in ways that were extremely hard for her to do on a regular basis.  (Tr. 131.)  She explained: "even as a cashier you're having to constantly move about your area to ring in customers' purchases and it is just making -- you have to stoop, bend, and do all these things and it is extremely difficult . . . to do all these on a regular basis."  (*Id*.)  She attributed her physical limitations to fibromyalgia pain in her legs, knees, and back.  (*Id*.)  She was not taking any oral medications for her pain; she had most recently been on Lyrica for about a year and a half, but it did not work.  (Tr. 131-32.)  The pain in her legs and back came and went, but her knee pain was constant.  (Tr. 138.)  There really was not much she could do for the pain except take "warm baths every now and then when the pain [got] to be too much during the day" because there were no other medications for her to try for her pain.  (Tr. 132.)  Although warm baths with Epson salts helped relieve her pain to some extent, it was difficult for her to get in and out of the bathtub due to her weight.  (Tr. 139.)  She used a shower chair because she did not have the stamina to stand in the shower for the time needed to wash herself.  (Tr. 139-40.)

Ms. Nelson estimated that she could: sit for about two hours before she would have to get up and move; stand for no more than a couple of minutes before she would have to change positions; and walk for only a couple of minutes before she would have to stop.  (Tr. 140.)  She could comfortably lift about five pounds.  (*Id*.)  Although not prescribed, she had been using a cane for about two years for support due to her pain and dizziness upon standing.  (Tr. 140-41.)  She slept a lot but still had a lot of fatigue which she attributed to her fibromyalgia.  (Tr. 141-42.)

16

In addition to her pain, Ms. Nelson said that her diabetes, depression, and anxiety affected her ability to work.  (Tr. 132.)  She said that her anxiety and depression caused a lot of physical symptoms, such as stomach pain and vomiting.  (Tr. 132, 142.)  At the time of the hearing, she had been having a stomachache every day and was vomiting about twice a week.  (Tr. 142.)  Her mind raced all time.  (Tr. 142.)  She also said that it was hard for her to relate or talk to people and she was not comfortable being around a lot of people.  (Tr. 132, 142-43.)  She felt like people were looking at her even though she knew that they were not.  (Tr. 143.)  She was taking Cymbalta and Abilify for her mental health issues.  (Tr. 132-33.)  The medication did not help as much as she would like.  (Tr. 133.)  The main issue with her Sjogren's syndrome was that it caused extreme dry mouth.  (*Id*.)

As far as taking care of herself and her daily activities, Ms. Nelson said it was very difficult for her to take care of her personal hygiene or do any chores.  (Tr. 133-34.)  She relied on her cousin to help her with both.  (Tr. 134.)  She used a delivery service for groceries.  (*Id*.)  She helped her ex-husband with cooking, but it was hard for her to stand for longer than five minutes at a time to prepare a meal.  (*Id*.)  She was unable to do the laundry because she lived on the third floor and the laundry was in the basement.  (*Id*.)  It was very hard for her to walk up and down the stairs because of her knees; she had to take one step at a time with her cane, so she could not carry the laundry.  (*Id*.)  She tried to help with some cleaning around the house, but had to rest for about twenty to thirty minutes after about five minutes of cleaning; her ex-husband did most of the cleaning.  (Tr. 135.)  During the day, she watched television.  (*Id*.)  She also used the computer and checked her email for about two hours.  (*Id*.)  She had three cats.  (*Id*.)  She fed them their canned food, and her ex-husband fed them their dry food.  (Tr. 135-36.)  Her ex-husband also cleaned their litter box because it was too hard for her to bend down.  (Tr. 136.)

17

Ms. Nelson usually napped during the day, and then would prepare dinner and go to bed around 8:00 p.m.  (Tr. 136.)  Although she typically went to bed early, she did not actually sleep the whole night.  (*Id*.)  She spent time trying to find a comfortable position and did not sleep due to her anxiety.  (Tr. 136-37.)  As far as activities outside of the house, Ms. Nelson went to doctor appointments and visited her ex-husband's parents about once every two months.  (Tr. 137.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 127-30, 143-47.)  The VE classified Ms. Nelson's past work as: a composite of stock clerk and cashier checker, a semi-skilled, heavy exertion job performed at medium exertion; and housekeeper, an unskilled, light exertion job performed at light exertion.  (Tr. 127-30.)  The VE testified that a hypothetical individual of Ms. Nelson's age, education, and work experience and with the functional limitations described in the ALJ's RFC determination (Tr. 78-79, 144-45) could perform Ms. Nelson's past work as a housekeeper (Tr. 144-45) and other jobs in the national economy that included food service worker, sales attendant, and mail clerk (Tr. 145-46).

The VE also testified that the following limitations would be work preclusive: being off task 10% or more of the workday; being absent two or more days per month on a continuing basis; and requiring additional unscheduled rest periods.  (Tr. 146-47.)  The VE was unable to identify jobs that would be available if the individual needed to sit, stand, or walk at will, including walking away from her workstation at will.  (*Id*.)  Finally, the VE testified that the individual would not be able to perform the jobs identified in the first hypothetical if she needed to use a cane at all times while standing or ambulating.  (Tr. 147.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters*

*v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the Residual Functional

Capacity ("RFC") and vocational factors to perform other work available in the national

economy.  *Id.*

## IV.    The ALJ's Decision

In her August 31, 2021 decision, the ALJ made the following findings:[2]

1.    The claimant last met the insured status requirements of the Social Security
      Act on December 31, 2020.  (Tr. 75.)

2.    The claimant did not engage in substantial gainful activity during the
      period from her alleged onset date of August 24, 2018, through her date
      last insured of December 31, 2020.  (*Id.*)

3.    Through the date last insured, the claimant had the following severe
      impairments: Sjorgren's syndrome; depressive, bipolar, and related
      disorders; diabetes mellitus; hyperlipidemia; obesity; other disorders of the
      gastrointestinal system; tendinosis of the right shoulder; fibromyalgia;
      sleep apnea; and anxiety and obsessive-compulsive disorders.  (*Id.*)

4.    Through the date last insured, the claimant does not have an impairment or
      combination of impairments that met or medically equaled the severity of
      the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr.
      75-78.)

5.    Through the date last insured, the claimant had the residual functional
      capacity to perform light work as defined in 20 C.F.R. § 404.1567(b)
      except: the claimant could never climb ladders, ropes, or scaffolds; could
      occasionally climb ramps and stairs; could occasionally balance, stoop,
      kneel, crouch, and crawl; could frequently perform overhead reaching;
      could never have concentrated exposure to extremely cold temperatures;
      could never have exposure to hazards (heights, machinery, or commercial
      driving); could perform no more than simple, routine tasks but not at a
      production-rate pace; could frequently have interactions with coworkers,

---

[2] The ALJ's findings are summarized.

supervisors, and the public; and could undergo no more than occasional, routine workplace changes.  (Tr. 79-85.)

6.    Through the date last insured, the claimant was capable of performing past relevant work as a housekeeper.  (Tr. 85.)  As an alternative finding, through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were other jobs existing in the national economy that the claimant was also capable of performing, including food service worker, sales attendant, and mail clerk. (Tr. 86-87.)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, at any time from August 24, 2018, through December 31, 2020, the date last insured.  (Tr. 87.)

## V.    Plaintiff's Arguments

Ms. Nelson presents two assignments of error, both relating to the ALJ's evaluation of medical opinion evidence.  First, she argues that the ALJ erred when she found the opinion of her treating rheumatologist Dr. Antonelli unpersuasive.  (ECF Doc. 10, pp. 1, 10-14.)  Second, she argues that the ALJ erred when she found the opinions of the state agency medical consultants persuasive and formulated the RFC based on those opinions.  (*Id*. at pp. 1, 14-15.)

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical

bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.    Assignments of Error**

Ms. Nelson challenges the ALJ's evaluation of medical opinion evidence in both of her assignments of error.   First, she contends that the ALJ erred in finding the opinion of her treating rheumatologist Dr. Antonelli unpersuasive.  (ECF Doc. 10, pp. 1, 10-14.)  Second, she contends that the ALJ erred in finding the opinions of state agency medical consultants Drs. Siddiqui and Mutchler persuasive, and in formulating her RFC finding based on those opinions.  (*Id*. at pp. 1, 14-15.)  The Commissioner responds that the ALJ reasonably evaluated the opinions of Dr. Antonelli and Drs. Siddiqui and Mutchler.  (ECF Doc. 14, pp. 6-11.)

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c(a); *see Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020).  The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. § 404.1520c(c)(1)-(5).  The most important factors are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).  ALJs must explain how they considered consistency and supportability, but need not explain how they considered the other factors.  20 C.F.R. § 404.1520c(b)(2).

**1.    First Assignment of Error: Whether ALJ Properly Evaluated Opinion of Treating Rheumatologist Dr. Antonelli**

The ALJ evaluated the persuasiveness of Dr. Antonelli's opinion as follows:

Maria Antonelli, M.D. completed a form a questionnaire on the claimant's behalf on July 6, 2021 (Exhibit B7F). First, Dr. Antonelli indicated that the claimant could occasionally lift ten pounds and frequently lift one or two pounds. Next, Dr.

Antonelli indicated that the claimant could stand or walk for a total of one-to-two hours of an eight-hour workday but only for one minute without interruption. Dr. Antonelli indicated that the claimant could sit for 16-plus hours total but only two hours without interruption. Dr. Antonelli indicated that the claimant could never perform any of the postural activities listed on the form but could frequently perform all the manipulative limitations on the form. Dr. Antonelli checked that the claimant did not have any of the environmental restrictions on the form. Dr. Antonelli indicated that no assistive device had been prescribed to the claimant. Dr. Antonelli checked that the claimant would need to alternate positions between sitting, standing, and walking at will. Dr. Antonelli indicated that the claimant experienced moderate pain that would interfere with concentration, take the claimant off task, and cause absenteeism. Finally, Dr. Antonelli indicated that the claimant would require additional breaks during a day of one to two hours. Regarding, exertional and postural limitations, Dr. Antonelli cited to the "physical and history." I do not find these opinions persuasive. The opinions are supported by a vague statement regarding physical and history. Neither are the opinions consistent with the evidence including Dr. Antonelli's treatment notes.  For instance, at the claimant's most recent visit with Dr. Antonelli, the claimant indicated that she had been doing laundry on the basement level which included three trips up and down the stairs (Exhibit B4F, page 38). The claimant also indicated that she had been doing a lot of walking in the area. However, the claimant reported that Lyrica did not help at all. Medrol was noted as helping the joints and improving leg pains (Exhibit B4F, page 40). At an earlier examination with Dr. Antonelli, the claimant was alert (Exhibit B1F, page 17). The claimant had stable gait. An examination showed tenderness in the knees and pain on range of motion but was otherwise unremarkiable. The claimant was described as having a good response to Gabapentin but swelling. These findings are not consistent with the extreme limitations on the form such as only being able to stand for one minute without interruption. Being alert shows that the claimant does not have moderate pain that would take her off task or cause absenteeism. I find the State agency consultants' opinions more persuasive because they are more consistent with the evidence.

(Tr. 82-83 (emphasis added).)

Ms. Nelson argues that the above explanation provides a "limited, incomplete rationale" that "does not undermine the core opinions" rendered by Dr. Antonelli.  (ECF Doc. 10, p. 12.) More specifically, she asserts that the ALJ "cherry pick[ed] the evidence, inflate[d] the value of minor activities to everyday occurrences, and [did] not build a logical bridge between the evidence and the conclusion." (*Id*. at pp. 12-13.)  When the medical records are not cherry picked, Ms. Nelson argues the record is "fully consistent with Dr. Antonelli's central finding:

24

that Ms. Nelson's chronic pain and fatigue markedly interferes with her everyday life" and "would preclude her from maintaining steady workplace attendance and remaining on-task without the need for considerable accommodations for additional breaks."  (*Id*. at pp. 13-14.)

An ALJ may not cherry pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.  *See, e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014); *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013).  However, "an ALJ does not 'cherry pick' the evidence merely by resolving some inconsistencies unfavorably to a claimant's position."  *Solembrino v. Astrue*, No. 1:10–cv–1017, 2011 WL 2115872, at *8 (N.D. Ohio May 27, 2011).  Indeed, arguments that an ALJ has cherry picked evidence are "seldom successful because crediting it would require a court to re-weigh record evidence."  *DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. 2014) (citing *White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 284 (6th Cir. 2009)).

In support of her argument that the ALJ cherry picked the records in support of her persuasiveness finding, Ms. Nelson argues that the cited records—specifically, "records that discuss Ms. Nelson being able to perform some amount of walking and walking up and down stairs, and physical examinations that found Ms. Nelson to exhibit a steady gait, normal extremity strength, and ranges of motion"—are "an exception and not the norm."  (ECF Doc. 10, p. 13.)  But she neglects to identify what evidence supports her characterization of the cited evidence as "an exception" rather than "the norm."  To the extent she is suggesting the normal examination findings highlighted by the ALJ were inconsistent with the records, the only abnormal examination findings identified in her own statement of facts were tenderness and restricted or painful ranges of motion.  (*Id.*, at pp. 4-5 (citing Tr. 425, 692.)  The ALJ acknowledged those limited findings but highlighted the unremarkable nature of the examination

25

findings as a whole.  (Tr. 80-83.)  An independent review of the record supports a finding that Ms. Nelson's examination findings were consistent with the findings noted by the ALJ.  (*See, e.g.,* Tr. 421-22, 424-25, 435, 441, 655-56, 805-06, 825.)  Ms. Nelson has thus failed to show that the ALJ cherry picked the objective medical evidence in support of her persuasiveness analysis.  And any argument that the self-reported activities noted by the ALJ were cherry picked is likewise unsupported, as the ALJ's decision discussed a wide range of reported activities and limitations, and ultimately concluded that "the objective evidence d[id] not support the alleged level of limitation."[3]  (Tr. 79-82.)  Thus, Ms. Nelson's argument that the ALJ erred because she cherry picked the evidence in support of her persuasiveness analysis lacks merit.

Ms. Nelson's more general argument that the ALJ provided a "limited, incomplete rationale" for her persuasiveness analysis (ECF Doc. 10, p. 12) also lacks merit.  In fact, the ALJ articulated several reasons for finding Dr. Antonelli's opinions not "persuasive" and properly considered the supportability and consistency of the opinions.  First, the ALJ noted that Dr. Antonelli's opinions were supported only by "a vague statement regarding physical and history" (Tr. 83), referencing Dr. Antonelli's practice of citing generally to "physical" or "physical exam" and "history" when asked for the medical findings supporting her opinions (Tr. 813).  The Sixth Circuit has found similarly "vague and unhelpful" references undermined the value of a medical opinion.  *See Price v. Comm'r Soc. Sec. Admin.*, 342 F. App'x 172, 176 (6th Cir. 2009) (explaining that an ALJ properly discounted a medical opinion that referred to "testing" and did not identify objective medical findings in support of his opinion because such a response was "vague and unhelpful").  Second, the ALJ noted that the evidence—including Dr. Antonelli's own treatment notes—were "not consistent with the extreme limitations" described in the

---

[3] Ms. Nelson has not challenged the ALJ's findings regarding her subjective complaints in this appeal.

opinions, "such as only being able to stand for one minute without interruption." (Tr. 83.) This finding in consistent with the generally normal examination findings discussed above. It is also consistent with conservative treatment limited to the oral medications, as described in the persuasiveness analysis (*id.*) and in more detail earlier in the ALJ's decision (*see, e.g.,* Tr. 80 ("The current record continues to show conservative, pharmacological management with improvement of both physical and mental systems. As explored below, examinations were generally unremarkable."). Finally, the ALJ noted that she found the conflicting medical opinions of the state agency medical consultants to be "more persuasive because they are more consistent with the evidence." (Tr. 83.) Ms. Nelson has not met her burden to demonstrate that the ALJ inadequately articulated her persuasiveness finding.

Ms. Nelson repeatedly argues that the record evidence is consistent with Dr. Antonelli's findings (ECF Doc. 10, pp. 12, 13, 14), but that is not the question before this Court. Even if a preponderance of the evidence would support a finding that Dr. Antonelli's opinions are persuasive, this Court cannot overturn the ALJ's finding to the contrary "so long as substantial evidence also support[ed] the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406. Ms. Nelson has not met her burden to show that the ALJ lacked substantial evidence to support her finding that Dr. Antonelli's opinions are not persuasive.

For the reasons stated above, the Court finds that the ALJ has sufficiently explained her rationale for concluding that Dr. Antonelli's opinions were not persuasive, and that Ms. Nelson has not met her burden to show that the ALJ failed to consider the entirety of the record or that the ALJ's findings lacked the support of substantial evidence. Accordingly, the Court finds the first assignment of error to be without merit.

2.     **Second Assignment of Error: Whether ALJ Properly Evaluated Opinions of State Agency Medical Consultants Drs. Siddiqui and Mutchler**

The ALJ evaluated the persuasiveness of the state agency medical consultant opinions as follows:

> Mehr Siddiqui, M.D., a State agency medical consultant, reviewed the claimant's case file on June 4, 2020 (Exhibit B4A). Dr. Siddiqui adopted the previous administrative findings. Gail Mutchler, M.D., a State agency medical consultant, reviewed the claimant's case file on March 7, 2021, and affirmed Dr. Siddiqui's findings (Exhibit B6A). Dr. Mutchler cited to the medical record. I find these opinions persuasive. The opinions are supported by the cited evidence. While I am not bound by the previous findings due to changes in how we evaluate obesity and the listing for joint dysfunction, these opinions remain consistent with the evidence. For instance, at the claimant's most recent rheumatology visit, the claimant indicated that she had been doing laundry on the basement level which included three trips up and down the stairs (Exhibit B4F, page 38). The claimant also indicated that she had been doing a lot of walking in the area. However, the claimant reported that Lyrica did not help at all. Medrol was noted as helping the joints and improving leg pains (Exhibit B4F, page 40). At an earlier examination with Dr. Antonelli, the claimant was alert (Exhibit B1F, page 17). The claimant had stable gait. An examination showed tenderness in the knees and pain on range of motion but was otherwise unremarkable. The claimant was described as having a good response to Gabapentin but swelling.

(Tr. 84 (emphasis added).)

Ms. Nelson argues that the ALJ erred in finding the state agency medical consultants' opinions persuasive because the consultants "simply adopted opinions rendered in a prior disability determination approximately three years earlier."  (ECF Doc. 10, p. 14.)  She asserts that this constituted error because the prior opinions "were rendered in 2018 **without** any physical examinations" and "[t]he three year gap means the underlying medical basis of the ALJ's opinion occurred without access to a significant part of the medical record, and are undermined by the substance of the current evidence."  (*Id.* at p. 15 (emphasis in original).)  The Commissioner responds that Ms. Nelson's argument "completely ignores" the state agency medical consultants' consideration of medical records through 2021.  (ECF Doc. 14, p. 11.)

Consistent with the Commissioner's arguments, the record reflects that the state agency medical consultants reviewed Ms. Nelson's updated treatment records before opining that her physical RFC remained the same as that described in the 2018 ALJ decision.  (Tr. 178-79, 188, 191.)  Indeed, when Dr. Mutchler affirmed Dr. Siddiqui's initial findings upon reconsideration on March 7, 2021, she explained that she reviewed the prior ALJ decision and Ms. Nelson's interval medical evidence of record, which included records through January 2021.  (Tr. 188, 191.)  After acknowledging the additional treatment, Dr. Mutchler nevertheless concluded that the prior RFC remained supported by the new evidence.  (*Id*.)  Thus, the record reflects that the state agency RFC opinions were not based on outdated medical records ending in 2018.

Further, "[t]here is no categorical requirement that the non-treating source's opinion be based on a complete or more detailed and comprehensive case record."  *See Helm v. Comm'r of Soc. Sec.*, 405 F. App'x. 997, 1002 (6th Cir. 2011) (internal citations and quotations omitted). "The opinions need only be supported by evidence in the case record." *Id.*  And if the opinion "is not based on a review of a complete case record," there must simply be "some indication that the ALJ at least considered" the later medical records.  *Fisk v. Astrue,* 253 F. App'x. 580, 585 (6th Cir. 2007) (internal citations and quotations omitted).  Here, the ALJ explicitly considered Ms. Nelson's updated treatment since the 2018 ALJ decision, noted that she was not bound by the prior RFC findings, and found the state agency medical consultant opinions persuasive because they were supported by and consistent with the full evidentiary record.  (Tr. 80-81, 84.)

Ms. Nelson's conclusory argument that the state agency medical consultants' opinions are "wholly inconsistent with the medical record," which she contends shows her "pain and fatigue substantially curtail her activities to such a degree that she requires help from family with even basic activities of daily life" (ECF Doc. 10, p. 15), does not alter this Court's analysis.  As

discussed above, the ALJ considered Ms. Nelson's subjective complaints (Tr. 79-80), treatment records (Tr. 80-82), and the opinion evidence (Tr. 82-83) before finding the state agency medical consultants' opinions to be supported by evidence reflecting largely normal examination findings, treatment with oral medications, and some continued activities of daily living (Tr. 84).

For the reasons stated above, the Court finds the ALJ sufficiently explained her rationale for concluding that the state agency medical consultant opinions were persuasive, and that Ms. Nelson has not met her burden to show that the ALJ's findings lacked the support of substantial evidence.  Accordingly, the Court finds the second assignment of error to be without merit.

## VII.    Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's final decision.

August 26, 2024

/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge

30